

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 1 4 2003

CLERK, U.S. DISTRICT COURT
BY_____
          DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| PABLO MELENDEZ, JR, § | |
|     Petitioner, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:00-CV-0190-Y |
| § | |
| JANIE COCKRELL, Director, § | |
| Texas Department of Criminal § | |
| Justice, Institutional § | |
| Division, Respondent. § | |

**MEMORANDUM OPINION AND ORDER**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS**
[with special instructions to the clerk]

Petitioner Pablo Melendez Jr., sentenced to death for capital murder, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that his conviction and sentence are unconstitutional in several respects. Respondent Janie Cockrell ("the State") filed a brief in response. The Court denies Melendez's petition for a writ of habeas corpus.

I
*History of the Case*

A jury convicted Melendez of the capital murder of Michael Sanders, and his punishment was assessed at death by lethal injection. *State v. Melendez*, Cause No. 0580494D (372nd Judicial District Court, Tarrant County, Texas, April 1, 1996). The case was appealed to the Texas Court of Criminal Appeals, and that court affirmed the conviction in an unpublished opinion. *Melendez v. State*, No. 72,420 (Tex. Crim. App. October 7, 1998), *cert. denied*, 527 U.S. 1025 (1999).

Melendez filed a state application for writ of habeas corpus on July 2, 1998. On October 2, 1998, the state habeas court issued findings of fact and conclusions of law denying relief based on the pleadings, the exhibits filed by the parties, and the court record. (State Habeas Transcript, pp. 335-38). The Court of Criminal Appeals denied relief in an unpublished written order adopting the trial court's findings of fact and conclusions of law. *Ex parte Melendez*, No. 43,131-01 (Tex. Crim. App. November 10, 1999). Melendez filed his initial federal petition for writ of habeas corpus on November 9, 2000, and his amended petition on December 22, 2000. The State filed an answer on February 20, 2001, and furnished the state court records.

The Texas Court of Criminal Appeals recited the following factual background in its opinion on direct appeal:

> At the guilt/innocence stage of trial, the State presented fifteen witnesses, including testimony from the surviving victim, to establish the circumstances surrounding the robbery/murder of which [Melendez] was convicted. Their testimony, if believed, established the following. On the evening of September 1, 1994, [Melendez], who was eighteen years old, visited and drank beer with a group of friends in the driveway of a Fort Worth residence. At approximately 11:30 p.m., [Melendez] stated, in a voice loud enough for most to hear, his intention to rob "some mother fucker," and he walked away alone.

> At that same time, in the nearby parking lot of a self-service wash, the two victims in this case had parked their pick-up truck parallel to a walk-up pay phone. They had been there a number of minutes when one of them, Tommie Joe Seagraves, noticed [Melendez] walking up behind the truck. As Seagraves looked on, he warned the truck's driver, Michael Sanders, of [Melendez's] approach. [Melendez] positioned himself about fifteen feet from the driver's side door. Without any warning or even a word being spoken, [Melendez]

2

turned and fired one shot into the cab of the vehicle, and it struck Seagraves in the neck. [Melendez] then announced his first demand that Sanders hand over all the money in the truck. As Sanders pleaded with [Melendez] not to shoot him, he was ordered from the vehicle, then forced to walk toward [Melendez] and hand over the money. Relieved of his money, Sanders turned and started back toward the truck where Seagraves still sat wounded and unable to move. Before he reached the vehicle, [Melendez] fired again and struck Sanders in the back. In rapid succession, [Melendez] fired three more shots and all struck Sanders in either the back or the arm. Sanders finally toppled forward through the open driver's side door and came to rest in the floorboard of the truck with his head resting against Seagraves' leg. As Sanders lay dying, [Melendez] approached, reached through the cab with the gun in hand, placed the muzzle next to Seagraves's forehead, and pulled the trigger. Nothing happened. The gun was empty, so [Melendez] simply turned and walked back in the direction he had come. In the end, Seagraves received two bullet wounds; the initial wound when [Melendez] first approached and a second wound received from a bullet that had passed through the decedent and struck Seagraves's arm. Sanders was shout four times and died within minutes.

*Melendez*, slip op. at 2-3.


## II
### *Standard of Review*

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, __ U.S. __, 122 S.Ct. 194, 151 L.Ed.2d 136 (2001). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-3 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001). Under

4

§ 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002 (2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas-corpus petitions that, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Resolution on the merits in the habeas-corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

### III
### *Issues Presented*

In four grounds for relief, Melendez alleges the following three complaints:

    A.    Melendez's due-process rights were violated because the prosecution failed to disclose material exculpatory evidence to the defense.

    B.    Melendez is actually innocent of capital murder.

    C.    Melendez's compulsory-process and equal-protection rights under the Sixth and Fourteenth Amendments and

5

rights under the Fourteenth Amendment were violated by
Rule 31 of the Texas Rules of Appellate Procedure, which
governs motions for new trials.

Melendez also requests an evidentiary hearing before this Court.

## IV
### *Discussion of Claims*

### A.   <u>Brady claim</u>

Melendez contends that his due-process rights were violated because
the prosecution suppressed relevant, material evidence.  Specifically,
Melendez asserts that the State suppressed information provided to the
prosecutors by the victim's mother, Gracie Jett, prior to Melendez's
trial.  Melendez further asserts that this information is material
because it is evidence that someone other than Melendez committed the
murder.

### *Applicable Facts*

On April 8, 1996, twenty-seven  days after Melendez had been
sentenced to death, Melendez filed a motion for new trial, alleging
generally that the conviction was contrary to the law and evidence.
(Transcript, vol 1A, pp. 254, 401.)  Then, on April 18, 1996, Melendez
filed an amended motion for new trial, alleging that evidence had
recently been discovered that had been suppressed by the State. (Tr.
1A:408-9.)

At the hearing on the amended motion for new trial that was held
on May 13, 1996, the trial judge began the proceedings by stating that,

6

contrary to his previous belief, he did not believe that he had jurisdiction to consider the amended motion for new trial because it had been filed more than thirty days after Melendez's sentence had been imposed. (R. XXXVIII:2-5.)  Nevertheless, the trial judge ruled that he would hear Melendez's timely filed motion for new trial and would allow the defense attorneys to make a bill-of-exceptions record regarding the amended motion for new trial in order to preserve Melendez's rights and in the event that the Texas Court of Criminal Appeals determined that he did have jurisdiction to rule on the amended motion for new trial.   The trial judge then immediately denied Melendez's initial motion for new trial and then heard testimony from several witnesses in support of the amended motion for new trial. (R. XXXVIII:18-19.)

Gracie Jett, the mother of the murder victim, testified for the defense at this hearing.  She testified that in an attempt to solve her son's murder, she spoke with people who were located near the crime scene.  Several weeks after the murder, she spoke by telephone with a man named Jeffrey Jackson, who at that time owned a barbeque restaurant a block from the car wash where the murder occurred. (R. XXXVIII:34-36.)  Jett further testified that Jackson was an elderly man who told her that, about 11:30 p.m. on the night of her son's murder, he was closing up his restaurant when he heard several gunshots. Immediately after the gunshots he heard someone scream "The MFs are shooting at me."  He further told her that he and his girlfriend drove

to the carwash, saw a white truck parked by the telephone and saw a black truck parked on Long Avenue with a white woman sitting inside this truck. (R. XXXVIII:38-41).    Finally, Jackson told Jett that he saw two Hispanic males in the parking lot going through the pockets of a man in the white truck.  When he asked these men if they needed help, one of them told him that everything was under control.  At that point he felt that something was not right and he left.  Jackson also told her that, if asked, he would relay this information to the police. (R. XXXVIII:40-42.)

Jett also testified at the motion for new trial hearing that she conveyed this information to Diane Tefft, the Fort Worth police detective who was handling the case, but was told by Tefft not to get involved in the investigation. (R. XXXVIII:44-46.)  She further testified that she also gave this information to Mike Parrish, the lead prosecutor in the case, after he was assigned the case and she was advised by Parrish that Melendez was the person who killed her son. (R. XXXVIII:52-54.)  Jett stated that she did not tell defense attorneys about this information until after the trial because she did not become convinced until the trial that Melendez was not the killer.  Jett admitted on cross-examination at the same hearing that she did not attend all of the trial. (R. XXXVIII:57-58, 64-65.)

Larry Hickman, the defense investigator for Melendez's trial, also testified at this hearing.  Hickman testified that after Jett gave the defense attorneys the information about Jeffrey Jackson shortly after

the trial, he and Melendez's two trial attorneys met with Jackson. At this meeting, Jackson stated that he would testify in court about what he witnessed on the night of the murder. When Hickman later served Jackson with a subpoena, however, Jackson stated that he intended to ignore the subpoena. Jackson did not report to the hearing as he was ordered to do by the subpoena served on him. (R. XXXVIII:82-3.)

Affidavits signed by both Hickman and Jackson were admitted as exhibits at the hearing on the motion for new trial. In his affidavit, dated April 18, 1996, Hickman states that Jackson told him when he interviewed him on March 28, 1996, that he was closing his restaurant at about 11:30 p.m. on the evening of September 1, 1994, when he heard someone yell "help me" from the direction of the car wash. He looked over towards the car wash and saw two vehicles. He then drove over to the car wash, where he saw a white pickup in the parking lot and a dark colored pickup truck parked in the street. He also saw two Hispanic males by the white truck, one of whom appeared to be going through the pockets of a person inside the driver's door of the truck, and a white woman sitting inside the dark truck. When he asked the men if he could be of any help, he was told that everything was under control, so he went back to his restaurant. Hickman also states in this affidavit that Jackson told him that he was willing to sign an affidavit attesting to what he told Hickman and was willing to testify in court about it. (SHTr.:149-151.)

9

In his own affidavit, dated May 9, 1996, Jeffrey Jackson states that he was closing his business on the evening of September 1, 1994, at around 9:30 or 10:00, when he heard hollering coming from the car wash. He drove to the car wash, where he saw a blue pickup truck by the pay phone and a dark colored truck on the street. He saw one Hispanic male by the blue truck and a woman sitting in the dark truck. When he asked the Hispanic man near the blue truck if he needed assistance, he responded that "everything was under control." He further states that there was no one else at the scene other than this Hispanic male and the woman in the truck. (SHTr. 156.)[1]

On direct appeal, the Court of Criminal Appeals ruled that the trial court did not have jurisdiction to consider Melendez's amended motion for new trial as it was filed more than thirty days after sentencing. *Melendez*, slip op. at 25-6. However, the state habeas judge, who was also the trial judge, did consider the testimony from the hearing on the motion for new trial when addressing Melendez's *Brady* claim at the state level. During the state habeas process, there were also affidavits submitted from Diane Tefft, the lead detective in the

---

[1]

This affidavit appears to have originally been drafted by someone on the defense team for Jackson to sign, because it is typed and outlines a similar story to the one Hickman relates in his affidavit. However, prior to signing this affidavit, Jackson altered its contents by crossing out and changing relevant information in the affidavit, such as the time he heard something coming from the car wash, what he heard, and the color of the truck he saw in the parking lot of the car wash. He also crossed out any reference to his seeing someone going through the pockets of someone in the white pickup truck. (SHTr.:156). Indeed, in his testimony at the hearing on the motion for new trial, Hickman acknowledged that Jackson had apparently given three different stories to Jett, to Hickman, and in his own signed affidavit. (R. XXXVIII:84-85).

case, and Mike Parrish and Mary Galus, the two prosecutors who tried the case. (SHTr.:246-49, 318-19, 321-22.)   In their respective affidavits, all three of these individuals deny that Gracie Jett ever told them about Jeffrey Jackson. (SHTr.:248-49, 318-19, 321-22.) Moreover, Tefft included all of her investigative notes with her affidavit, and she states in her affidavit that she not only does not remember Jett telling her anything about Jackson, but her notes do not indicate that such information was passed on to her.   Tefft further states in her affidavit that because this case was not solved for a number of months she would not have ignored any possible leads that would have been provided to her only a few weeks after the murder. (SHTr.:248, 250-316.) Both of the prosecutors state in their affidavits that there was evidence of another truck at the scene of the murder shortly after the shooting and that the defense was aware of this information. (SHTr.:319, 321.)

As support for this assertion, the State submitted Tommie Seagraves's written statement, as well as the written statement of Susie Carillo, one of the witnesses in the neighborhood, as evidence at the state habeas level.  In his written statement, Seagraves mentions that after the shooting a Mexican man, who had a younger boy with him, stopped behind the truck and asked Seagraves what was wrong. (R. XL:state's ex. #47.)   In her statement, signed two days after the offense, Carillo states that after hearing the shots and seeing a man run up the street, she went outside on her porch and heard a man crying

11

"please help me."  She then walked down to the car wash after calling 911, and when  she arrived at the car wash a group of men in a pickup truck had stopped at the scene, and one of the men had gone over to try and help one of the men in the truck. (SHTr.:324.)

In addressing Melendez's *Brady* claim, the state habeas court  found that Jett was not a credible witness at the motion for new trial. Nevertheless, the court further found that even if her version of what Jackson saw was accurate, Jackson never claimed to have seen the shooting and his version was not inconsistent with the information given by other witnesses. (SHTr. 336.)  The state habeas court then concluded that Melendez had failed to establish that material evidence was withheld from the defense. (SHTr. 338.)

### *Applicable Law*

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the State violates a defendant's due-process rights under the federal constitutional.  And under *Brady*, the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985).  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the

12

suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678; *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998).

### *Analysis*

The state habeas court's conclusion that Melendez had failed to establish either that evidence was withheld from him or that that evidence was material to his conviction is not an unreasonable application of federal law. The state habeas judge who witnessed, at the hearing on the motion for new trial, Gracie Jett's claim that she told the State about Jackson, made a factual finding that she was not a credible witness. This finding is entitled to deference by this Court, in the absence of clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). As Melendez has failed to provide this evidence, there is adequate factual support for the state habeas court's conclusion that Melendez failed to prove that evidence was withheld from the defense.

Furthermore, even if it is assumed that evidence was withheld from the defense, and even if this evidence is viewed in the light most favorable to Melendez, it is not material to his conviction. The most favorable version of Jackson's story was recounted by Jett. But, even if her hearsay version of events is accepted as the actual events as Jackson viewed them, there is no reasonable probability that, had the defense been aware of these events and presented them to the jury, Melendez would not have been convicted of capital murder.

As noted earlier, both Seagraves and Carillo gave written statements to the police indicating that other people were at the car wash after the shooting besides Carillo. And, in her statement, Carillo specifically mentions seeing a pickup truck at the scene with several men in it, one of whom attempted to help. Thus, these statements do not contradict Jackson's story of hearing someone yelling, then driving to the car wash and seeing two men by the car, one going through the pockets of the victim. Accordingly, defense counsel was not only aware of similar information provided by other witnesses, but Jackson's information is not inconsistent with the statements of these witnesses.

Moreover, the materiality of *Brady* evidence is dependent on the value of the evidence relative to the other evidence presented by the State at trial. *Spence v. Johnson*, 80 F.3d 989, 995(5th Cir. 1996). In the instant case, substantially the same information Jackson gave about the night of the offense was presented to the jury. First, the fact that the murder victim's pockets were turned out was testified to by both the paramedic and police detective at the scene. (R. XXX:235-36, 281). The information Jackson provided may have helped to explain why the pockets were turned out, but it would not have cast doubt on Melendez's guilt. And, the paramedic further testified that there were several people at the car wash who waved the ambulance down as it approached (R. XXX:209), and a Fort Worth police officer testified that he spoke to a Hispanic male civilian at the scene of the murder. (R.

approached (R. XXX:209), and a Fort Worth police officer testified that he spoke to a Hispanic male civilian at the scene of the murder. (R. XXXIII:735.)   Therefore, as the record makes clear, Jackson's hearing gunshots and someone yelling and then witnessing a dark pickup truck and two Hispanic men at the scene, one looking through the pockets of the murder victim, is not contrary to Melendez's conviction.   Instead, since everything Jackson witnessed at the scene was after the shooting, it is consistent with testimony given by other witnesses at trial and statements made by other persons at the scene.   Melendez has failed to establish that any material information was withheld from the defense.   His first ground is therefore without merit, and it is overruled.

## B.   Actual-Innocence claim

In his second claim for relief, Melendez asserts that he is entitled to relief because he is actually innocent of capital murder. Specifically, Melendez asserts that he is actually innocent because of: 1) Jeffrey Jackson's affidavit; 2) the refusal of Tommie Seagraves, the surviving victim, to speak to Melendez's federal writ attorneys; 3) the similarity between Seagraves's composite sketch of the shooter and Roel Gonzales; 4) the lack of physical evidence linking Melendez to the crime; 5) the lack of a confession from Melendez; and 6) the fact that Seagraves admitted to having cocaine in his system at the time of the shooting.

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court addressed a claim that a federal habeas petitioner was actually innocent based on newly discovered evidence. The Supreme Court held that a claim of actual innocence based on newly discovered evidence does not and has never been held to be a basis for federal habeas relief absent an independent constitutional violation occurring in the state proceeding. *Id.* at 400. The Court then assumed, for the sake of argument, that in a capital case a "truly persuasive" showing of actual innocence would render the execution of an individual unconstitutional and thus warrant federal habeas relief if no state avenue existed to entertain such a claim. The Court stated that the threshold showing for such an "assumed right" would be "extraordinarily high." *Id.* at 417. The Court then concluded that conflicting affidavits, submitted eight years after a trial, when considered in light of the strong evidence presented at trial supporting guilt, did not meet this threshold. *Id.* at 417-18.

Since *Herrera* was handed down by the Supreme Court, the Fifth Circuit has specifically rejected the argument that a showing of actual innocence would warrant habeas relief if there were no state avenue open to process such a claim. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001). Accordingly, under both Supreme Court and Fifth Circuit case law, Melendez is not entitled to federal habeas relief based on a claim of actual innocence.

16

Moreover, Texas does have an avenue in which to pursue actual-innocence claims.  In *State ex. rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 398-99 (Tex. Crim. App. 1994), the Texas Court of Criminal Appeals held that actual innocence could be the basis for state habeas relief, provided that a petitioner establish, as a threshold, that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict.  And subsequently, in *Ex parte Elizondo*, 947 S.W.2d 202, 208-09 (Tex. Crim. App. 1996), the court held that in order for a petitioner to prevail on an actual-innocence claim, he must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence.  Indeed, the state habeas court addressed Melendez's actual-innocence claim and concluded that he had failed to meet the threshold standard set forth in *Elizondo* necessary to prove he is actually innocent. (SHTr. 338.)

Finally, even if this Court were to address Melendez's actual-innocence claim on its merits, it fails.  As noted earlier, Jackson's version of events, whether presented through Jett's and Hickman's hearsay testimony or through his own affidavit, is not inconsistent with Melendez's guilt.  And, the fact that a surviving victim is unwilling to speak to defense attorneys is hardly support for Melendez's actual-innocence claim.  Moreover, the lack of physical evidence and the fact that Tommie Seagraves admitted to using cocaine at the time

of the shooting were known to the defense and were throughly explored at trial. (R. XXX:214, 376-77, 402, 484-85, 488, 527-34.)

Furthermore, while Melendez did not precisely *admit* to killing Mike Sanders, he signed a written statement, admitted into evidence at trial, in which he stated that he was at Robert Gonzales's house on the night of the murder, which was up the street from the car wash. He also acknowledged in this statement that Gonzales had given him a .25 caliber automatic gun a couple of days before. Then, Melendez states that he does not remember what happened before he was sitting on the porch with money in one hand and the gun in the other. He further states that he heard sirens, his friend Johnny Ayala was yelling at him, and Johnny took the gun and money from him, took him inside the house, and told him to take off his clothes. Finally, in his statement Melendez says that he went to sleep in the house that night, that Ayala gave him the money back the next day, and that when he asked about his clothes Ayala told him that he had thrown them away because the police asked Ayala on the night of the offense about seeing someone wearing a white shirt, and Melendez wore a white shirt that night. (R. XL:state's ex. #43.) Thus, while not, strictly speaking, a confession to murder, Melendez's statement places him near the scene at the time of the murder, puts him in possession of a gun of the same caliber used to kill the victim, sets out his possession of an amount of money near the amount Seagraves reported being taken, and shows his being aided

by a friend in the concealment of evidence. (R. XL:state's ex. #47.) This statement supports Melendez's guilt, not his innocence.

Finally, Melendez's claim that the composite sketch made by Seagraves is "remarkably similar" to the visage of Roel Gonzales and dissimilar to Melendez's bears some comment. At trial, the defense attorneys argued in their summations to the jury that the sketch did not look like Melendez and presented evidence to support this claim, including testimony by two State's witnesses, Robert Gonzales and Debbie Flores, that the sketch did not look like Melendez at the time of the murder because Melendez did not have a moustache and goatee at that time. (R. XXXIII:766-67, 777, ?.) Thus, this claim is not newly discovered evidence.

Moreover, Melendez seems to assert that Jackson's affidavit, taken with the lack of physical evidence and the differences between the sketch and his appearance, are all evidence that the State's witnesses conspired against him to frame him for the murder in order to protect Roel Gonzales, who is Robert Gonzales's brother. This claim not only ignores the fact that both Robert Gonzales's and Debbie Flores's testimony regarding Melendez's actions at Gonzales's house on the night of the murder was consistent with Melendez's own statement, but also fails to acknowledge that neither Gonzales nor Flores could be considered willing State's witnesses. Neither came forward to the police with information about the murder in the several months that the crime remained unsolved. In fact, Gonzales did not speak to the

police until he was contacted by Detective Tefft *after* Melendez had given his statement (R. XXX:55, 84). And Flores, Melendez's former girlfriend, did not reveal what she knew until she was subpoenaed by the grand jury and testified there. Thus, neither spoke to the authorities until after Melendez gave his statement, and their version of events is remarkably similar to his own. (R. XXX:133, 177).

Moreover, in his direct testimony for the State, Gonzales acknowledged that he allowed Melendez to sleep in his house, even after Melendez told him that he had "messed up" and might have hurt or killed someone. Gonzales also admitted that, after he heard police sirens outside, he gave Melendez a change of clothes and exchanged the gun and the now empty clip to a man for a ring a couple of days later without ever reporting this incident to the police. (R. XXX:47-50, 52-61). The record therefore reflects that Gonzales, and to a lesser extent Flores, were interested in aiding Melendez, not harming his case. Accordingly, while Melendez became a suspect after Johnny Ayala, who was in the Tarrant County jail in February of 1995 and evidently looking to improve his own situation, told the police about what he knew about Melendez's involvement in the murder (R. XXX:421), Melendez has produced no credible evidence that Gonzales's and Flores's testimonies were manufactured in an effort to protect Roel Gonzales.

Furthermore, while Flores testified that Roel Gonzales was at his brother's house on the night of the murder, she also testified that he did not leave that location until after the group who were

congregated there heard the police sirens, whereas Melendez left the scene prior to that, proclaiming that he was going to "jack" someone. (R. XXX:140-45.) In sum, there is simply no evidence that Roel Gonzales was involved in the murder. By contrast, Melendez's guilt was established at trial by Melendez's own statement; the testimony of Flores and Gonzales; Detective Tefft's and Tommie Seagraves's testimony about Seagraves's immediate identification of Melendez as the shooter from a photographic line-up (R. XXX:442; XXXI:502-03); Seagraves's identification of Melendez as the shooter at trial (R. XXXI:498-99); and the testimony of Susie Carillo and Francisco Maldonado, who both testified that they saw one man, dressed similarly to Melendez as his clothing was described by both Gonzales and Flores, run in the direction of Robert Gonzales's house after they heard shots fired at the car wash. (R. XXX:123-27, 183-86.) Given all of this evidence supporting Melendez's conviction, and the lack of newly discovered controverting evidence, Melendez has failed to meet the extraordinarily high threshold necessary to establish an actual-innocence claim, even if such a claim were viable on federal habeas review. Melendez's second ground for relief is without merit and is overruled.[2]

---

[2]

Melendez also asserts that, even if he is not entitled to relief on this claim under *Herrera*, he is entitled to relief on this claim under the standard set forth in *Schlup v. Delo*, 513 U.S. 298 (1995). *Schlup*, however, set forth the actual-innocence standard to be used when a petitioner attempts to establish actual innocence as a gateway through which a federal habeas court may consider a procedurally defaulted claim. Id. at 316. Here, Melendez is not asking this Court to consider any procedurally defaulted claim, and *Schlup* is therefore not relevant.

C.   **Motion for New Trial**

In his third and fourth grounds for relief, Melendez asserts that his equal-protection, compulsory-process, and due-process rights were "impermissibly abridged" by Rule 21.4, formerly Rule 31, of the Texas Rules of Appellate Procedure.  Specifically, Melendez claims that Rules 21.4(a) and 21.4(b), which provide that any motion for new trial or amended motion for new trial based on newly discovered evidence must be filed within thirty days of the date that the trial court imposes the sentence in a criminal case, deprived Petitioner of developing a thorough record to support his *Brady* claim and his actual-innocence claim.  *See* Tex R. App. P. 21.4.   In particular, Melendez asserts that because his lawyers were not allowed to compel the testimony of Jeffrey Johnson, his right to compulsory process was violated.   And Melendez argues that his equal-protection rights have been violated because thirty-five states have time limits for filing motions for new trial that are longer than Texas's thirty-day limit.

In *Herrera v. Collins*, the Supreme Court addressed a claim that Rule 31 of the Texas Rules of Appellate Procedure, the predecessor to Rule 21.4, violates due process by requiring that any motion for new trial based on newly discovered evidence be filed within thirty days of sentencing. *Herrera*, 506 U.S. at 410-11.   The Supreme Court held that the time limit did not violate due process because, looking at the time limits imposed by the states and the federal government on

motions for new trial based on newly discovered evidence, Texas's time limit could not be held to violate the principles of fundamental fairness. *Id.* at 412. The Supreme Court also noted that Herrera was not without recourse, as he could apply for executive clemency at the state level based on his newly discovered evidence. *Id.* at 411-16.

In addressing this issue at the state level, citing *Herrera* and Texas state case law, the state habeas court concluded that Melendez's constitutional rights to compulsory process, equal protection, and due process were not impermissibly abridged by the thirty-day deadline for filing motions for new trial in Texas. (SHTr. 338.) This conclusion is not an unreasonable application of federal law. While the Supreme Court in *Herrera* only addressed a due-process claim and not an equal-protection claim or a claim based on the right to compulsory process, Melendez has presented no argument, much less case support, for his assertion that this appellate rule violates *any* of his federal constitutional rights. Accordingly, the state habeas court's reliance on *Herrera* in its denial of these claims at the state level is not an unreasonable application of federal law.

Moreover, Melendez's *Brady* and actual-innocence claims were addressed fully by the state habeas court. Indeed, in considering the merits of these two claims, the state habeas judge considered not only the testimony presented at the hearing on the motion for new trial over which he presided, but also considered additional affidavits submitted

23

by both Melendez and the State.   And, while the state habeas court determined that an evidentiary hearing was not necessary, Melendez does not assert that he would have been deprived of his right to compulsory process had one been granted.   Accordingly, the claims that Melendez was not allowed to pursue by way of a motion for new trial were addressed during the state habeas process.[3]   Melendez's third and fourth grounds for relief are without merit, and they are therefore overruled.

## D.   Request for Evidentiary Hearing

Melendez also requests that this Court grant him an evidentiary hearing.   Melendez asserts that he is entitled to an evidentiary hearing

---

[3]

Melendez also contends that his right to compulsory process has been violated because the trial court declined to issue a writ of attachment for Jeffrey Jackson at the hearing on his  motion for new trial.   The trial judge declined to do so based on his accurate belief that he did not, in fact, have jurisdiction to consider the amended motion for new trial on its merits.   Because Melendez has learned that Jackson has since died, Melendez asserts that the fact that the trial court did not have jurisdiction to consider his motion for new trial due to the thirty-day deadline has permanently prevented him from compelling Jackson's testimony.

It should first be noted that the weight of any hypothetical testimony that Jackson might have given in a live evidentiary hearing is questionable, given that he has changed his story in the past and refused to obey a summons from the court that was personally served on him.   Furthermore, the state habeas court issued its findings and conclusions regarding this case on October 1, 1998. (SHTr.:335-38.)   The evidence Melendez has presented to this Court indicates that Melendez did not become aware of Jackson's death until December 19, 2000. (Petition, ex. #19.)   It is therefore unclear whether Jackson would have been available to give testimony during the state habeas proceeding when Melendez's Brady and actual-innocence claims were first addressed, had the court found his testimony to be necessary.   But finally and most importantly, both the state habeas court and this Court have assumed that the version of Jackson's story most beneficial to Melendez was the correct version and have ruled based on this assumption.   Accordingly, it cannot be said that Melendez has been deprived of the benefit of the information given by Jackson.   If anything, Melendez has benefitted by the fact that Jackson has never been subject to cross-examination regarding his different versions of events and regarding his own refusal to obey the court.

24

in federal court because he did not receive one during the state habeas proceeding and because he did not fail to develop his claims at the state level. *See* 28 U.S.C. § 2254(e)(2).

Even if a petitioner does not fail to develop his factual claims in state court, he is not necessarily entitled to a hearing in federal court. Rather, as the Fifth Circuit has explained in recent cases, in order to be entitled to an evidentiary hearing in federal court, even where, as in the instant case, no evidentiary hearing was conducted by the state habeas court, a habeas petitioner must show either a factual dispute that, if resolved in his favor, would entitle him to relief *or* at the very least a factual dispute that would require development in order to assess the claim. *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir.), *cert. denied*, 531 U.S. 951 (2000); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998).

First, while the state habeas court did not conduct an evidentiary hearing, the state habeas judge did rely on the testimony given during the motion for new trial over which he presided in reaching his conclusions on Melendez's claims for relief. Thus, it cannot be said that Melendez had no opportunity to present relevant evidence under oath. Second, Melendez has not alleged any factual dispute which, if resolved in his favor, would entitle him to relief. While the State disputes that any information was kept from the defense, this Court has concluded that even if it is assumed that the State suppressed information and that information is taken in the light most favorable

25

to Melendez, it was not evidence that is material to Melendez's conviction. And, other than the inconsistencies between Jeffrey Jackson's various versions of event, which this Court has resolved in Melendez's favor, no other factual disputes exist. To the contrary, Melendez has used the facts presented at the hearing on his motion for new trial as support for his claims for relief. Melendez's claims in all of his grounds for relief are that the state court erred on collateral appeal in its application of federal law to the facts presented to them. Such claims do not entitle Petitioner to a hearing in federal court, and Melendez's request for one is denied.

It is therefore **ORDERED** that Petitioner's Petition for Writ of Habeas Corpus be, and is hereby, **DENIED**.

It is further **ORDERED** that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED March _14_, 2003.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be